**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | |
| **KEVIN HOLLOWAY** | : | **CRIMINAL NO. 24-167-JRS** |
| **MARK SCOTT** | | |
| **LINTON MATHIS** | : | |
| **ATIBA WICKER** | | |
| **KENNETH TUCK** | : | |

# GOVERNMENT'S TRIAL MEMORANDUM

## I. THE SUPERSEDING INDICTMENT AND TRIAL

On May 13, 2026, a grand jury sitting in this District returned a Superseding Indictment charging defendants Kevin Holloway, Mark Scott, Linton Mathis, Atiba Wicker, and Kenneth Tuck with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1), and aiding and abetting, in violation of 18 U.S.C. § 2. ECF 155. At trial, the government anticipates marking/entering approximately 200 exhibits, while calling approximately 30 witnesses. The government's case-in-chief is expected to last approximately two to three weeks. Trial is scheduled in this matter for November 16, 2026.

## II. SUMMARY OF FACTS AND RULINGS ON ADMISSIBILITY OF CERTAIN EVIDENCE AT TRIAL

The facts of this case have been recounted several times during the pendency of litigation and are well known to the Court and documented consistently throughout various docket entries, including the Superseding Indictment and motions by the government. *See, e.g.*, ECF 97, 149, 155. Additionally, the Court has ruled on various motions determining the scope or admissibility of certain evidence. *See, e.g.*, ECF 187, 189, 190.

### A. Factual Background

In summary, in or about the Spring and Summer of 2006, defendant Kevin Holloway owed an approximately $300,000 drug debt to Person #4, a violent drug dealer in Philadelphia who was released from federal prison on August 4, 2006, and was looking to Holloway for remuneration.

Around this time, Co-conspirator #1 – a friend of Holloway and defendants Linton Mathis and Mark Scott – forged a friendship with Co-conspirator #2, who was a cocaine dealer in Philadelphia. Co-conspirator #2 and defendant Atiba Wicker were mutual friends with Shamari Taylor, who was a cocaine dealer in West Philadelphia. Knowing that Holloway needed cocaine and money to repay his debt to Person #4, Co-conspirator #1 enlisted the help of Co-conspirator #2 and Wicker to have Taylor supply Holloway with cocaine. Thereafter, in July 2006, in West Philadelphia, Taylor transferred a kilogram of cocaine to Co-conspirator #2 and Wicker who then sold it to Co-conspirator #1 and Holloway in exchange for approximately $20,000.

In the days that followed, Holloway and Co-conspirator #1 sought to purchase more cocaine from Taylor, so they asked Co-conspirator #2 and Wicker to set up another deal. But upon further discussion and reflection, especially with insight offered by Wicker that Taylor routinely possessed upwards of 10 kilograms of cocaine at a time, the notion of Holloway purchasing more cocaine from Taylor morphed into a plan to steal cocaine from Taylor. Over the next few weeks, Holloway recruited Scott, Mathis and Co-conspirator #1, as well as two other acquaintances, Co-conspirator #3 and Co-conspirator #4. These men were assisted by information supplied by Wicker, who provided details on Taylor's cocaine supply to ensure that it was robust when the time came to rob Taylor. Co-conspirator #2 funneled this information from Wicker to Co-

conspirator #1, who in turn provided details to Holloway, Mathis and Scott. Co-conspirator #2 agreed to lure Taylor to a specific location so he could be robbed.

During the planning phases of the plot, Holloway envisioned his accomplices dressing up as police officers so they could kidnap Taylor, which would be perceived as a lawful arrest without raising Taylor's suspicion at the time of the robbery. This idea caused Co-conspirator #1 to recruit his cousin, defendant Kenneth Tuck, to join the plot because Tuck's appearance could supposedly pass as resembling a police officer at the time. The plan to kidnap Taylor, which was ironed out over multiple meetings between the defendants, was geared toward bringing Taylor to a location where he would be interrogated about his cocaine stash so Holloway and his accomplices could then steal it. To facilitate this part of the conspiracy, Holloway endeavored to use a warehouse he owned on North 3rd Street in Philadelphia where Taylor's interrogation could occur with assured privacy.

On the evening of August 26, 2006, Co-conspirator #2 told Taylor to meet him at a bar in West Philadelphia and to bring a kilogram of cocaine with him so he could sell it to Co-conspirator #1 and Holloway. Co-conspirator #1 was positioned nearby and watched Taylor from a distance, relaying his location via cellphone to Holloway and the others, some of whom were dressed as police officers, so they could eventually ambush Taylor and execute the kidnapping. When Taylor arrived at the bar, he was accompanied by a girlfriend, Person #1. Co-conspirator #2 directed Taylor and Person #1 to follow him in their car so they could travel to the site where the drug deal would occur. Co-conspirator #2 then led Taylor and Person #1 to a stretch of road in West Philadelphia where Holloway, Mathis, Scott, Tuck, Co-conspirator #3 and Co-conspirator #4 were waiting. When they arrived, Co-conspirator #2 sped away while Tuck, Co-conspirator #3 and Co-

conspirator #4, dressed as police officers and armed with pistols and equipped with police-style strobe lights, effected a phony traffic stop on Taylor and Person #1.

Taylor and Person #1 were handcuffed and forced into the rear of another vehicle and were eventually driven to Holloway's warehouse in North Philadelphia. During the abduction on the street, Tuck and Person #1 recognized each other – they had been in a romantic relationship several years earlier when Person #1 was a teenager. But, at the time, both of them kept their recognition of one another to themselves. Upon arrival at Holloway's warehouse, Holloway, Scott, Mathis and Co-conspirator #1 led Taylor and Person #1 inside where they were separated from each other. Holloway tortured Taylor as part of the interrogation, burning him with a blowtorch in the process. Taylor told his captors that he kept additional cocaine and some money at his mother's house on Wyalusing Avenue in West Philadelphia. Holloway, Scott and Mathis then held Taylor down and suffocated him to death. The men later dumped Taylor's body in Fairmount Park and released Person #1 in a residential neighborhood near the Park. At the outset of the abduction, Holloway stole the kilogram of cocaine that Taylor brought with him to what he believed would be a drug transaction. Holloway sold the cocaine on the street the next day and divvyed up the proceeds to his co-conspirators.

On August 27, 2006, Taylor's mother's residence in West Philadelphia was raided by two-armed men who stole an unknown amount of money and drugs while Taylor's mother and sister were home. During the home invasion, Taylor's mother and sister both suffered non-fatal gunshot wounds to their heads. It became apparent to several members of the conspiracy that this home invasion at Taylor's residence was connected to the kidnapping, which was no surprise considering the object of the kidnapping was to steal whatever money and drugs Taylor had. Indeed, Wicker,

who had been advised by Co-conspirator #2 that Taylor was kidnapped and was receiving updates about the incident throughout the evening of August 26 and morning of August 27, took it upon himself to outsource the home invasion to two of his accomplices who were not parties to the kidnapping plot, Person #5 and Person #6. Wicker later admitted this to Co-conspirator #2, that is, that he sought to get drugs and money out of the Taylor residence before his accomplices could get steal it.

Soon after, Tuck left town because he feared Person #1 would report his involvement in the kidnapping to police. Person #1 did just that, and Tuck went to New York City to hide out. Tuck stayed in contact with Co-conspirator #1 via the telephone in the days that followed. Shortly thereafter, Philadelphia Police obtained a warrant for Tuck's arrest and news of his suspected involvement in the crime was circulated in the local news media.

At the same time, knowing that Tuck was wanted by Philadelphia Police, Holloway concluded that Tuck was a risk to the members of the conspiracy and sought to have Tuck murdered to prevent him from cooperating with the police when he was arrested. Holloway recruited Person #10 to kill Tuck. On August 31, 2006, Person #10 attempted to gun down Tuck in Camden, New Jersey, but Tuck survived and was arrested at a local hospital after being treated for multiple gunshot wounds. This prompted Holloway and Co-conspirator #1 to pay Tuck's attorney's fees in connection with his prosecution in Philadelphia County, hoping that payment for costs associated with a trial would assure Tuck's silence and ultimately his acquittal.

Holloway sought to further cover his tracks. He enlisted the assistance of Person #4, who helped Holloway clean the room in the warehouse where Taylor was held and then murdered. Person #4 also loaned Holloway pickaxes and shovels to dig the hole where Taylor's body would

be eventually buried.[1] In early September 2006, Holloway, Scott, Co-conspirator #1 and Co-conspirator #3 retrieved Taylor's decomposing body from Fairmount Park and buried it in a vacant lot in North Philadelphia that Holloway had preselected.

Tuck was brought to trial in 2007 and 2008 in Philadelphia County after he was charged with kidnapping Person #1. He was not charged with murdering Taylor because Taylor was still missing at the time of Tuck's local trials. The first trial ended in a hung jury, and Tuck was acquitted at the second trial. During the first trial, Co-conspirator #1 bribed his then-girlfriend, Person #9, to testify falsely on Tuck's behalf about his whereabouts around the time he was shot in Camden. That alibi testimony was fabricated, and Person #9 and Co-conspirator #1 later admitted as much.

The investigation of Taylor went cold after Tuck's second trial ended in 2008. But, in 2013, Person #4 provided details about Holloway's involvement in the murder of Taylor and about other details of their criminal relationship together. In August 2018, Co-conspirator #1, who decided to cooperate with the government after he was convicted on state drug trafficking charges, led FBI agents to Taylor's burial site in North Philadelphia. Taylor's remains were unearthed from what is now the parking lot of a charter school, and his skeleton was identified by his dental records.

[1] Person #4 owned a home on West Silver Street in Philadelphia, and in the Summer of 2006, he rented it to Holloway. In 2013, based upon information provided by Person #4, FBI agents recovered several boxes of files from the basement of Person #4's house on West Silver Street. Holloway had since moved out of the house several years earlier. The files in the basement included documents belonging to Holloway, including the property ownership paperwork for the warehouse where Taylor was murdered.

Co-conspirator #1's cooperation provided corroborating evidence about the 2006 kidnapping as well as the identities of his co-conspirators – Holloway, Scott, Mathis, Wicker, Tuck, Co-conspirator #2 and Co-conspirator #3. Eventually, Co-conspirator #2 agreed to cooperate with investigators, and he too provided insight into the plot's details as well as Wicker's involvement in the planning and the aftermath of the crime, including the home invasion at Taylor's mother's house. Law enforcement also collected and analyzed cellphone records from the dates surrounding and including August 26-27, 2006, and identified detailed networks of various cellular communications between combinations of Holloway, Scott, Mathis, Tuck, Wicker, Co-conspirator #1, Co-conspirator #2 and Taylor. The defendants were arrested on the indictment in early May 2024.

**B. <u>The Court's Rulings on Admissibility of Evidence in Pretrial Motion Practice</u>**

The Court has already ruled that the government may elicit testimony regarding Holloway's massive drug debt to Person #4 that existed in the Summer of 2006. ECF 187, p. 8. The Court will also permit evidence regarding law enforcement's seizure of a mail parcel containing approximately $100,000 in California that was shipped from Philadelphia by Holloway the day before the kidnapping, as evidence of financial losses he suffered, making it more difficult for Holloway to repay his debt to Person #4. ECF 187, p. 9. As a result of his predicament, the government will introduce testimony and evidence that Holloway was motivated to make money quickly, so he enlisted the help of his friends and acquaintances to (1) engage Taylor in one uneventful drug deal in or about July 2006, and (2) pretend that they intended to engage in a second drug deal but instead kidnap Taylor and force him to reveal where he kept his stash of cocaine and drug proceeds so it could be stolen.

The Court has suppressed evidence related to an approximately $200,000 cash seizure from Holloway's residence one year before the kidnapping, which the government had sought to introduce as further proof of Holloway's drug debt to Person #4. ECF 190. However, the Court recognized that the government may introduce this evidence to impeach Holloway's defense if he opens the door to receiving a $185,000 settlement with the City of Philadelphia – which was most of the money seized from his residence in 2005 – to establish he was not strapped for cash or insolvent. *See* ECF 190, p. 3 ("The Government notes in its opposition that if the evidence is suppressed, it intends to introduce evidence for impeachment purposes in the event Holloway testifies regarding the $185,000 settlement he received from the City of Philadelphia incident to this seizure. The exclusionary rule does not prohibit such use. *See Walder v. United States*, 347 U.S. 62, 65 (1954)).

The Court has also permitted the government to introduce testimony regarding Wicker's knowledge about the breadth of Taylor's cocaine supply, which was related to Wicker having previously received cocaine from Taylor resulting in Wicker being indebted to Taylor. ECF 187, pp. 10-11. The government will introduce testimony from Co-conspirator #2 regarding Wicker's motivation to commit the kidnapping and share information about Taylor's cocaine supply with Holloway and his accomplices, that is, to extinguish Wicker's debt to Taylor.

The Court has ruled that the government may not introduce evidence of Wicker's parole status at the time of the kidnapping and can only present evidence of his living situation in a halfway house if Wicker opens the door by suggesting that he could not have participated in the offense because he was on parole, or some other argument that his parole status inhibited his opportunity to commit the crime.

The Court's rulings have confined the government to introduce certain evidence in several respects. Accordingly, consistent with the Court's rulings, the government will not introduce evidence of Holloway's prior bad acts, to include robberies, murders and drug trafficking between 2004 and 2006. The government will also not introduce evidence of Wicker's prior drug trafficking activities with Taylor in 2002 and 2003. The government will not introduce evidence of a 1993 arson committed by Tuck and Mathis, nor will the government introduce evidence of Wicker's parole status or incarceration with Co-conspirator #2. Nevertheless, in the event a defendant opens the door to any of these areas of interest – either through argument, cross-examination, or testimony – the government reserves the right to seek admission of the evidence through rebuttal witnesses or on redirect examination.

## III. THE LAW AND ELEMENTS OF THE OFFENSE CHARGED IN COUNT ONE

**<u>18 U.S.C. §§ 1201(a)(1) and 2 (kidnapping resulting in death, and aiding and abetting)</u>**

18 U.S.C. § 1201(a)(1) provides, in relevant part—

> **(a)**Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when—
> **(1)** . . . the offender . . . uses . . . any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;
> . . .
> and, if the death of any person results, shall be punished by death or life imprisonment.[2]

To find a defendant guilty of the crime of kidnapping, which resulted in the death of a person, in violation of 18 U.S.C. § 1201(a)(1), the government must prove each of the following

[2] This is not designated as a death eligible case. Accordingly, the maximum and mandatory penalty upon conviction is lifetime imprisonment.

elements beyond a reasonable doubt:

(1) that the defendant seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim;

(2) that the defendant held the victim for ransom or reward and property belonging to the victim;

(3) that the defendant used . . . any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;[3]

(4) that the defendant acted unlawfully, knowingly, and willfully; and

(5) that the defendant's acts resulted in the death of the victim.

*See* Modern Federal Jury Instructions-Criminal P. 42.01 (2018) *Chatwin v. United States*, 326 U.S. 455, 461-64 (1946); *United States v. Toledo*, 985 F.2d 1462, 1465 (10th Cir. 1993); Modern Federal Jury Instructions—Criminal § 42.01.

To find a defendant guilty of kidnapping resulting in death because he aided and abetted a principal in committing this offense, the government must prove each of the following elements beyond a reasonable doubt:

(1) that the principal committed the offense charged, that is, kidnapping, by committing each of the elements of the offense described above;

(2) that the defendant knew that the offense charged was going to be committed or was being committed by the principal;

---

[3] The government may satisfy this element by proving beyond a reasonable doubt that the defendant traveled in interstate or foreign commerce in committing or in furtherance of the commission of the offense or that he used the United States mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense. The term "means, facility, or instrumentality of interstate or foreign commerce" includes the use of the telephone or the Internet in furtherance of the commission of the offense. 2 Modern Federal Jury Instructions-Criminal P 42.01 (citing *United States v. Horton*, 321 F.3d 476, 479-81 (4th Cir. 2003); *United States v. Bankston*, 603 F.2d 528 (5th Cir. 1979); *United States v. Windham*, 53 F.4th 1006 (6th Cir, 2022); *United States v. Small*, 988 F.3d 241, 251-52 (6th Cir. 2021); *United States v. Burnette*, 170 F.3d 567, 571 (6th Cir. 1999); *United States v. Singh*, 483 F.3d 489, 494-95 (7th Cir. 2007); *United States v. Napier*, 518 F.2d 316 (9th Cir. 1975); *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014); *United States v. Denny-Shaffer*, 2 F.3d 999 (10th Cir. 1993); *United States v. Lewis*, 115 F.3d 1531 (11th Cir. 1997)).

(3) that the defendant knowingly did some act for the purpose of assisting the principal in committing the offense charged and with the intent that the principal commit that specific offense; and

(4) that the defendant performed an act in furtherance of the offense charged.

*See* Third Circuit Model Jury Instructions (Criminal) 7.02.

## IV. THE GOVERNMENT'S WITNESSES

### A. **Expected Witness List**

The government anticipates calling approximately 30 witnesses in its case-in-chief at trial. The government will provide a full and complete list of its witnesses at the Pretrial Conference on November 12, 2026. Until then, pursuant to the protective order issued by this Court, the government will refer to certain witnesses by abbreviations or monikers consistent with those used in the Superseding Indictment. Accordingly, the government may call the following witnesses in its case-in-chief—

Law Enforcement:

1. FBI Special Agent Kevin Lewis – Case agent 2018 to present
2. FBI Special Agent Desiree Maxwell – Case agent 2013 to 2015
3. DEA Special Agent David McNamara (ret.) – Cellphone call examiner and analyst
4. PPD Detective Kathryn Gordon – Special Victims Unit investigator for Person #1's abduction and home invasion at Taylor residence
5. Camden (NJ) Police Detective Julio Rios (ret.) – Lead investigator of Tuck shooting
6. FBI Special Agent Matthew Yaeger – Team leader for recovery of Taylor's remains
7. Brea (CA) Police Detective Shannon Buckels (ret.) – K-9 handler and law enforcement officer who recovered cash in the mail parcel in California in August 2006
8. PPD Lieutenant Phil Riehl (ret.) – Homicide Lieutenant and fugitive apprehension investigator for Tuck
9. PPD Detective Timothy Scalley – Homicide detective and fugitive apprehension investigator for Tuck
10. PPD Detective Robert Hesser – Fugitive apprehension investigator for Tuck

Civilians:[4]

11. Person #1 – Kidnapping victim
12. Person #3 – Taylor's sister/home invasion victim
13. Person #5 – Home invader
14. Person #10 – Tuck shooter in Camden
15. Person #11 – Witness at Holloway garage
16. Accomplice #1 – Cooperating witness
17. Accomplice #2 – Cooperating witness
18. Person #4 – Cooperating witness
19. Person #9 – Cooperating witness
20. Civilian Witness 1 – Acquaintance of Taylor
21. Civilian Witness 2 – Acquaintance of Taylor
22. Civilian Witness 3 – Acquaintance of Tuck
23. Civilian Witness 4 – Acquaintance of Holloway
24. Civilian Witness 5 – Acquaintance of Scott

Experts:

25. DEA Special Agent Joshua Romig – Drug trafficking dynamics expert
26. FBI Special Agent Jeffrey Guagliardo – Cellular phone telecommunications network expert
27. Dr. Khalil Wardak – Forensic pathology expert
28. Dr. John Nase – Dental identification expert
29. Dr. Arthur Washburn – Anthropology expert
30. Craig Judd – DNA expert
31. Jaleela Hart – DNA expert
32. Jean Hess – DNA expert
33. Lisette Vega – DNA expert

The government reserves the right to supplement its witness list as may be required and/or once the defendants provide an indication as to what, if any, defense will be advanced or whether the defendants intend to put on a case. A final witness list will be provided to the Court and

[4] The witnesses' identities will be provided in advance of trial in accordance with the government's disclosures pursuant to the Jencks Act, 18 U.S.C. § 3500(a), and no later than November 6, 2026, which is 10 days before trial commences, as noticed in the government's letter in opposition to Tuck's Supplemental Omnibus Motion [ECF 164], filed on May 20, 2026. *See* ECF 165, at p. 3.

counsel in advance of jury selection. The government reserves the right to call the witnesses in any order and expand upon or limit the proposed testimony above.

Further, given the volume of the evidence and the length of the trial, in order to make the evidence more comprehensible to the jury, the government respectfully requests the Court to permit it to call the case agent, FBI Special Agent Kevin Lewis, multiple times throughout the trial in an effort to provide the jury with a comprehensive presentation of the evidence and testimony and to build upon topics covered by other witnesses who will also testify.

**B. <u>Expert Testimony</u>**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

Fed. R. Evid. 702. The government intends on qualifying certain witnesses as experts in the field of forensic pathology, anthropology, dental identification, interstate function and usage of the cellular telephone network, DNA analysis, and drug trafficking dynamics to include the subculture of individuals who target drug dealers for robbery. These witnesses will be examined on their expertise in the field of their work and opine on the conclusions they have drawn after examining evidence in this case or explaining relevant aspects about which they have specialized knowledge. On January 14, 2026, and September 25, 2026, the government provided notice of its intention to call these experts and disclosed the scope of their intended testimony as well as their respective *curriculum vitae* in accord with Fed. R. Crim. Pro. 16(a)(1)(G).

### C. Cooperators and Plea Agreements with the Government

There are certain witnesses in custody, or who are currently or previously were under court supervision, who may testify during this trial. These witnesses have entered into plea agreements with the government (or another prosecuting agency) and have pled guilty pursuant to their agreement. The government will turn over the discovery related to these witnesses' guilty pleas before trial, by November 6, 2026. Evidence of a witness' plea agreement is permissible to allow the jury to assess the witness' credibility, to eliminate any concern that the defendant has been singled out for prosecution, and to explain how the witness possessed detailed first-hand knowledge regarding the events about which he or she testifies. *See United States v. Universal Rehab. Servs., Inc.*, 205 F.3d 657, 667 (3d Cir. 2000) (en banc).

In direct examination, the government intends to discuss the written plea agreements and discuss the witnesses' responsibilities under the terms of the agreements, including the witnesses' obligation to tell the truth. Such testimony may properly be introduced by the government. *See United States v. Ramos*, 27 F.3d 65, 67 n.4 (3d Cir. 1994).

The witnesses' intent to plead guilty and plea agreement may not be considered as evidence of a defendant's guilt. *See Universal Rehab. Servs.*, 205 F.3d at 668; *United States v. Gaev*, 24 F.3d 473, 476 (3d Cir. 1994); *United States v. Gambino*, 926 F.2d 1355, 1363 (3d Cir. 1991). The Third Circuit has held that, in such cases, the jury should be instructed that it may not consider the guilty plea and/or plea agreement as evidence that the defendant is guilty of the offenses with which he is charged. *See Universal Rehab. Servs.*, 205 F.3d at 668; *Gaev*, 24 F.3d at 478. Accordingly, the United States respectfully requests that the Court give a

cautioning instruction to the jury with respect to the testimony of the witnesses. *See* Third Circuit Model Criminal Jury Instructions, § 2.22 ("Witness Who Has Pleaded Guilty to the Same or Related Charges").

Importantly, the offense of kidnapping resulting in death is a death eligible offense upon conviction. However, the government did not seek the death penalty for any cooperating witness or defendant in the case. Therefore, the maximum penalty available is lifetime imprisonment. To the extent the government or defense counsel references a witness's plea agreement, which contains a statement regarding the maximum possible penalty – that is, life imprisonment or death – the government requests that the Court issue a contemporaneous instruction to the jury that no person involved in this case, be it a cooperator or defendant, is subject to the death penalty whatsoever, and that the imposition of a sentence or punishment is solely under the control of the Court and not any party.

## V. STIPULATIONS

The government may send proposed stipulations to defense counsel for consideration in an effort to enter evidence in lieu of live witness testimony on issues of authenticity of certain business records, and other issues not in contention; these stipulations could potentially shorten the length of trial but not likely by much.

## VI. POTENTIAL OR ANTICIPATED TRIAL ISSUES

### A. The Defendants' Discovery Obligations

The government notes that its obligation to make available pretrial discovery materials is governed primarily by Rule 16 of the Federal Rules of Criminal Procedure. That rule requires the government to produce certain categories of information upon request of the defendant. Fed. R. Evid. 16(a). However, once the defendant demands discovery material the government is entitled

to request and receive certain reciprocal discovery from the defendant. Fed. R. Evid. 16(b). In regulating discovery, the court may, if a party fails to comply with its obligations, "prohibit that party from introducing the undisclosed evidence." Fed. R. Evid. 16(d)(2)(C).

The government provided the defense with a vast array of discovery including various documents, business records, photographs, law enforcement reports, statements, and laboratory reports during the course of discovery. The government has also demanded reciprocal discovery pursuant to Federal Rule of Evidence 16(b). Although requested, the government has not received any material or reciprocal discovery from the defendants to date, aside from a notice of the defendants' intent to call a supposed expert witness employed by Cornerstone Discovery.

If the government does not receive timely reciprocal discovery, the government may move to preclude the defendant from presenting during his case-in-chief any photographs, books, papers, documents, data, tangible objects, buildings, places, or copies thereof as required pursuant to a reciprocal discovery demand made by way of Federal Rule of Evidence 16(b)(A). Similarly, the government may move to preclude the defendants from presenting during their case-in-chief any evidence or reports of physical, mental, or scientific examinations or the use of expert testimony as required pursuant to a reciprocal discovery demand made by way of Federal Rule of Evidence 16(b)(B) and (C).

To that end, the government believes it is possible that at least one defendant, most likely Tuck, will seek to advance an alibi defense at trial. However, no defendant has affirmatively stated his clear intention to do so. As such, the government demands prompt notice of an alibi defense consistent with the contours of Federal Rule of Criminal Procedure 12.1(a)(2).

**B. <u>Use of Law Enforcement Reports of Interview to Cross-Examine Witnesses</u>**

Pursuant to its discovery obligations, the government has, or will, disclose the reports of witness interviews by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports or notes. *See United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992). The burden "of proving that notes reflect the witness' own words rather than the note taker's characterization falls on the party seeking to introduce the notes." *Id.* Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness' statement. *See id*. at 30. In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise inadmissible is not backdoored into evidence and read into the record. *See United States v. Shoenborn,* 4 F.3d 1424, 1427-28, n. 3 (7th Cir. 1993).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried. *Id*. at 28. One defendant sought to impeach the agent by admitting interview notes taken by an Assistant U.S. Attorney who had interviewed the agent, as a prior inconsistent statement. *Id*. at 28-29. The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant as an impeaching prior inconsistent statement and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has

> subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible. *Id*. at 29 (citation omitted).

In this case, the defendant should not be permitted to cross-examine witnesses using any portion of the reports, or to admit notes or reports to impeach the underlying subjects of those interviews.

**C. <u>Exhibits - Presented in Electronic Format and Hard Copies for Court and Counsel</u>**

The government anticipates that it will seek to mark or offer more than 200 exhibits at trial. The government will provide defense counsel and the Court with copies of the exhibits in binders (if practical based upon the nature and size of the exhibit) at the Pretrial Conference on November 12, 2026. Further, in order to move quickly and save significant time in presenting the evidence, the government will use a trial presentation program to allow for the exhibits' display electronically to the jury.

**D. <u>Summary Charts, Exhibits and Testimony</u>**

Pursuant to Federal Rules of Evidence 1006 and 107, the government hereby provides notice of its intent to introduce summary evidence by way of testimony, charts and illustrative aids at trial. Rule 1006 summaries serve as an evidentiary substitute for the voluminous originals, while Rule 107 aids function only as demonstrative tools that help clarify existing facts without adding new substantive proof.

Under Rule 1006, the government will offer certain charts as substantive evidence to prove the contents of voluminous admissible records, such as phone records, that cannot be conveniently

examined in court; these summaries will accurately reflect the underlying materials, which have been or will be made available to the defense for inspection in advance of trial.

In contrast, any visual aids offered under Rule 107 will be used solely to assist the jury in understanding testimony or already-admitted evidence and will not themselves constitute evidence or be provided to the jury during deliberations absent consent or court order.

Additionally, to advance a clear presentation of the evidence for the jury, the government intends to introduce some summary evidence based upon the overall investigation that spanned over the course of 20 years, explaining why and when law enforcement took certain investigative steps. This is permissible pursuant to Federal Rule of Evidence 104(b) ("*Relevance That Depends on a Fact* – When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."). Accordingly, the government anticipates Special Agent Lewis testifying at least three times throughout trial, with the first portion of his testimony covering the overall investigation and timeline of how it started and progressed to the eventual arrest of the defendants.

**E. <u>Sequestration</u>**

The government requests that all witnesses be sequestered except for FBI Special Agent Kevin Lewis, the case agent who coordinated the investigation and is assisting the government at trial. The government requests permission for Special Agent Lewis to sit at government counsel's table.

**F. <u>Impeachment of a Defendant</u>**

A defendant may elect to present a defense, and potential rebuttal witnesses may exist. If a

defendant testifies, the government reserves its right to call its own rebuttal witnesses, if deemed necessary and appropriate, and may request a brief adjournment during trial to evaluate any rebuttal case. If a defendant opens the door to cross-examination on the issue of his criminal history or prior bad acts or other crimes, the government will seek to impeach him with any prior bad act that may be relevant to his credibility and character for truthfulness. *See* Fed. R. Evid. 609(a)(1)(B).

**G. Co-Conspirator Statements**

At trial, the government intends to offer accomplice statements made in furtherance of the kidnapping scheme. The government will offer this evidence, in part, to establish the existence of the criminal conspiracies charged. Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, (3) the statement was made in the course of the conspiracy; and 4) the statement was made in furtherance of the conspiracy. *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.; see also McGlory*, 968 F.2d at 334. The district

court should consider the totality of the circumstances when deciding the admissibility of such evidence. “The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement,” should be considered by the trial court. *See* Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); *United States v. Traitz*, 871 F.2d 368, 399 (3d Cir. 1989). When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party’s participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175.

Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E). *Traitz*, 871 F.2d at 399.

The Third Circuit has commented that the “in furtherance” requirement is to be given a broad interpretation. *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985). Although the “during the course of” and “in furtherance” requirements do not overlap entirely, they are closely related. *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983). While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that “provide reassurance, serve to maintain trust and cohesiveness among co-conspirators, or inform each other of the current status of the conspiracy” further the conspiracy. *Id.*, at 252; *see United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); *United States v. Hudson*, 970 F.2d 948, 958-59 (1st Cir. 1992). For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the

conspiracy. *Ammar*, 714 F.2d at 253. In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).

The trial court may admit statements pursuant to the Rule even if the statements relate to a conspiracy not charged in the indictment. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent . . ." *Trowery*, 542 F.2d at 626.

## VII. OTHER ISSUES

### A. Pending Motions

As of this writing, which is filed on the due date of trial filings and motions *in limine*, the government anticipates that the parties will respond in opposition to each other's requests for various instructions or motions to admit/exclude/limit certain evidence or testimony.

For example, today, the government has filed an uncontroversial motion to admit various phone records as business records permissible under Federal Rule of Evidence 104, 803(6) and 902(11). Moreover, the government has also filed proposed jury instructions, *voir dire* and a verdict sheet. The government anticipates that at least one defendant may file a motion to exclude certain evidence. That said, the outcome of any motion may alter various representations stated in this Trial Memorandum. The government may file an amended memorandum in

advance of the Pretrial Conference on November 12, 2026, based upon any litigation settled beforehand.

### B. Reservation for Rebuttal Case

Again, potential rebuttal witnesses may exist, and his or her testimony would depend on whether a defendant elects to present any defense. The government reserves the right to call rebuttal witnesses, if deemed necessary and appropriate.

### C. Closing Arguments and Rebuttal

Because this is a trial involving five defendants who are represented by at least seven attorneys, all of whom will advance separate arguments on behalf of their respective clients, the government requests permission to divide its rebuttal time in closing arguments between the undersigned attorneys, allowing for each government attorney to address separate arguments advanced by different defense attorneys. The government is entitled to a rebuttal closing argument pursuant to Federal Rule of Criminal Procedure 29.1; the government hereby requests that government counsel be permitted to share their time to respond to defense counsels' arguments.

### D. Additional Trial Filings

Jury instructions, verdict sheets, *voir dire*, and motions *in limine* will be filed under separate cover today.

### E. **Anticipated Length of Government's Case**

Finally, the government anticipates that its case-in-chief will be concluded within approximately three weeks, including the Thanksgiving holiday break.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Justin T. Ashenfelter*
JUSTIN T. ASHENFELTER
LINDSEY T. MILLS
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Trial Memorandum has been served by electronic filing on defense counsel:

Alan Tauber, William Brennen, and John McCaul, Esqs.
(Counsel for Defendant Kevin Holloway)

David Nenner, Esq.
(Counsel for Defendant Mark Scott)

Nina Spizer, Esq.
(Counsel for Defendant Linton Mathis)

Caroline Donato, Esq.
(Counsel for Defendant Atiba Wicker)

Jeremy H.G. Ibrahim, Esq.
(Counsel for Defendant Kenneth Tuck)

*/s/ Justin T. Ashenfelter*
JUSTIN T. ASHENFELTER
Assistant United States Attorney

Date: October 8, 2026